(No.2560—

ARCOLE CONSTRUCTION COMPANY, A CORPORATION, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed January 14, 1941.*

*Rehearing denied March 11, 1941.*

SIDNEY LEVY, JAMES J. LAWRENCE, HENRY BLUMBERG and HOWARD J. DOYLE, for claimant.

JOHN E. CASSIDY, Attorney General; JOHN KASSERMAN and MAURICE J. WALSH, Assistant Attorneys General, for respondent.

Mr. Chief Justice Hollerich delivered the opinion of the court:

On or about December 14, 1933, respondent, through its Department of Public Works and Buildings, Division of Highways, mailed to claimant and other contractors a certain "Notice to Contractors," soliciting bids or proposals for the reconstruction of the pavement on Roosevelt Road in the City of Chicago, from Ashland Avenue to Canal Street, a distance of 1.3972 miles.

In and by such notice prospective bidders were advised that plans for said work prepared by the Department of Public Works and Buildings were available at the office of the District Engineer, and could be purchased at the office of the Division of Highways at Springfield, Illinois.

Claimant purchased a copy of such plans; examined and studied the same, and inspected the site of the proposed improvement before submitting its bid for the doing of the work. In and by its bid the claimant proposed to furnish all labor and materials necessary to complete said improvement according to said plans and specifications for the sum of $164,272.75, and at the unit prices therein specified.

Claimant was the low bidder on the project and was awarded the contract. On January 30, 1934 the respondent entered into a written agreement with claimant whereby the claimant agreed to do all the work, furnish all materials and all labor necessary to complete the work in accordance with the plans and specifications therein described, which plans and specifications were by said contract made essential documents and a part of said contract. Respondent agreed to pay the claimant for the work performed on a unit basis at the prices specified in claimant's proposal or bid.

The plans showed, among other items, a cross section of the proposed 9-inch Portland cement concrete pavement and a "Typical Cross Section for Existing Granite Block pavement."

The description of the improvement, as shown by the special provisions of the plans and specifications is as follows:

"This improvement consists of constructing a P. C. C. pavement between the existing curbs exclusive of the portion occupied by the Chicago Surface Lines, in accordance with the typical cross section as shown in the plans."

The aforementioned "Typical Cross Section for Existing Granite Block Pavement" (the pavement then in place) shows, among other things, a granite block pavement with an 8-inch Portland cement concrete base course. The evidence also shows that there was a two-inch sand cushion between said granite block pavement and said base course. The proposed improvement contemplated the removal of the existing pavement and base course to at least three inches below the sub-grade of the proposed pavement and the construction of a new pavement in accordance with the plans and specifications.

Claimant commenced work under its contract about March 30, 1934, and started operations with a steam shovel on the north side of the street in order to remove the granite block pavement, and followed shortly thereafter with other steam shovels to remove the 8-inch Portland cement concrete base course. Claimant then discovered that on the north side of the street extending through the entire length of the proposed improvement, there was an abandoned street car track foundation of very tough Portland cement concrete, which had imbedded in it the wooden ties formerly part of the street car track construction. This street car track foundation was approximately eighteen (18) feet in width and had a thickness of from sixteen to twenty inches and was bonded to the eight-inch concrete described in the "typical cross section" above referred to. The requirement of the specifications for excavation to at least three inches below the sub-grade of the proposed pavement necessitated the removal of the top three inches of the old street car track foundation. Such foundation was of very tough material and could not be removed in the same manner as the eight-inch Portland

cement concrete base, to wit, by steam shovels, but had to be cut and chipped off by compressed air methods.

Upon the discovery of the old street car track foundation claimant notified the officials of the Highway Department and a meeting with such officials was held on the site of the work. Claimant demonstrated to the representatives of respondent that said street car track foundation, or so much of it as was required to be removed, could not be removed by the usual and ordinary means employed. In an effort to solve the problem it was suggested that the grade of the proposed pavement be raised to such an extent that it would be unnecessary to interfere with the street car track foundation, but on account of drainage plans on the job, such suggestion was found to be impracticable. Several other suggestions were made, but on account of the refusal of the Federal Bureau of Highways to consent to a base of less than nine inches in thickness on the proposed improvement, it was impossible to change the plans, and the claimant proceeded with the work in accordance with the plans and specifications. Thereafter claimant completed the work required to be done under the contract, and the same was accepted and approved by the proper authorities of the respondent.

On December 26, 1934, claimant filed its complaint herein "for damages accruing to it in the sum of $24,944.85 for the cost of equipment, wages and other expenditures caused by being compelled to cut out and break loose the old concrete paving base on said project from the old street car track foundation and chipping and cutting the old street car track foundation to the sub-grade of the new pavement," and based its claim upon the following contentions, to wit:

A) That the plans and specifications for the improvement prepared by the respondent did not truly, accurately and correctly set forth the nature, character and amount of work to be performed by the claimant in the construction of the improvement.

B) That thereby the claimant was deceived and misled in making its proposal, and in entering into said contract.

C) That as a result thereof claimant was put to an expense of $24,944.85, which it would not have been required to expend had the conditions as to the sub-grade been as represented by the respondent in the plans and specifications.

Final payment estimate under the contract was scheduled for payment on January 14, 1935, and supplemental final payment estimate was scheduled for payment on June 28, 1935, and actual payments were made shortly after said respective dates.

On the hearing of the case it was stipulated by counsel for claimant and respondent that the claimant, in order to complete the improvement in accordance with its contract, broke loose the then existing concrete pavement base from the old street car track foundation; that such cutting and chipping was required to be done by compressed air methods in order to bring the old car track foundation to the proper sub-grade; that the Department of Public Works and Buildings checked the salaries, labor, equipment rental, rates and costs in connection with said work of cutting and breaking loose said existing concrete pavement base from said old and abandoned concrete street car track foundation, and that the reasonable cost of said work was $23,092.09, and that it cost the claimant to complete said improvement the sum of $23,092.09 over and above the amount it would have cost had it not been necessary to cut and chip said old concrete street car track foundation to the depth of the sub-grade of the new pavement.

It was also stipulated by counsel on the hearing that the provisions of Division One of Section 9.7 of the standard specifications be waived. Such provisions are to the effect that the acceptance of the last payment by the contractor shall operate as a release to the Department from all claims or liability under the contract.

Claimant takes the position that there was a material misrepresentation in the specifications as to the nature of the subgrade; that the specifications showed only an 8-inch Portland cement concrete base beneath the granite block pavement, whereas in fact, for the length of the entire improvement and for a width of eighteen feet, the Portland cement concrete base was from twenty-four to twenty-eight inches in thickness; that it had a right to rely upon said specifications; that it was deceived and misled thereby, and consequently bid less than it would have bid had it not been so misled; that it is therefore entitled to recover the loss sustained by it

on account of such misrepresentation, and that the amount of such loss is $23,092.09.

The respondent contends that claimant was not deceived or misled by any action of the respondent; that it was the duty of the claimant to inform itself of the nature of the sub-grade under the existing pavement, and having failed to do so it is not entitled to recover the cost and expense resulting from conditions which it did not anticipate; also that claimant is now seeking to obtain additional compensation for an expense incurred in performing the contract, and that a payment to the claimant therefor would be in violation of Section 19 of Article 4 of the Constitution of Illinois, which provides as follows:

"The General Assembly shall never grant or authorize extra compensation, fee or allowance to any public officer, agent, servant or contractor, after service has been rendered or a contract made, nor authorize the payment of any claim, or part thereof, hereafter created against the State under any agreement or contract made without express authority of law; and all such unauthorized agreement or contracts shall be null and void; *Provided*, the General Assembly may make appropriations for expenditures incurred in suppressing insurrection or repelling invasion."

Respondent also contends that the action of the claimant in accepting the last payment under the contract without objection or reservation constitutes a release of all liability under said contract; that such release is a substantial defense to this proceeding, and that the Attorney General had no authority to enter into a stipulation waiving same; also that the action of the claimant sounds in tort and is an action *ex delicto,* and that the State is not liable for the torts of its officers or agents.

The first question for consideration, therefore, is whether there was a material misrepresentation in the plans and specifications as to the nature of the sub-grade; if so, was the claimant misled thereby, and did he sustain damage by reason thereof?

The claimant, in support of its contention, relies upon the aforementioned "Typical Cross Section for Existing Granite Block Pavement," which shows an existing eight-inch Portland cement concrete base course underlying the existing granite block pavement, and the testimony of witnesses as to the proper meaning, construction and application thereof.

The respondent, in support of its contention, relies upon the following provisions of the proposal, plans and specifications, and the testimony of witnesses as to the proper meaning, construction and application thereof:

"The undersigned further declares that he has carefully examined the proposal, plans, specifications, form of contract and contract bond and special provisions (if any), and that he has inspected in detail the site of the proposed work and that he has familiarized himself with all of the local conditions affecting the contract and the detailed requirement of construction and understands that in making this proposal he waives all right to plead any misunderstanding regarding the same."

Description of Improvement. This improvement consists of constructing a P. C. C. Pavement between the existing curbs exclusive of the portion occupied by the Chicago Surface Lines in accordance with the typical crossing section as shown in the plans."

"Pavement Cross-Section. On this section, bids for Portland cement Concrete Pavement shall be based on a pavement cross-section with an interior thickness of nine (9) inches as shown by Special Cross-Section on Sheet 6 of the plans."

"Cross-Section of Existing Pavement. The dimensions shown on the typical cross-section of the existing pavement are approximate. This cross-section is shown to give the Contractor the approximate relationship between the existing cross-section and the proposed cross-section.

"Examination of Plans, Specifications, Special Provisions, and Site of Work. The bidder shall before submitting his bid or bids, carefully examine the proposal, plans, specifications, special provisions, and form of contract and bond. He shall inspect in detail the site of the proposed work and familiarize himself with all the local conditions affecting the contract and the detailed requirements of construction. If his bid is accepted, he will be responsible for all errors in his proposal resulting from his failure or neglect to comply with these instructions. The Department will, in no case, be responsible for any change in anticipated profits resulting from such failure or neglect."

"Special Excavation. All excavation shall be classified as "Special Excavation," and no other classification will be allowed. . . .

The removal of all types of pavement (including base course and wearing surface) curbs, sidewalks, driveways and structures shall be classified as 'Special Excavation.' Existing pavement, existing base course of any existing structure shall be removed to at least three inches below sub-grade of the proposed pavement or curb. . . ."

"The volume of special excavation for which payment shall be made includes only the cubic yardage between the surface of the ground pavement, curb, sidewalks or driveway as it existed at the time of starting the work on the improvement, and the ground pavement, sub-grade curb, sub-grade sidewalk, sub-grade or driveway sub-grade of the finished improvement. This volume shall be computed by the average and area method of com-

puting earth work. This volume may include any or all of the following materials: excavation of any nature, borrow, all types of pavement, (including wearing surface and base course) curbs, sidewalks, driveways and structures of any nature."

"Basis of payment. This work shall be paid for in the contract unit price per cubic yard for 'Special Excavation,' which price shall be payment in full for all excavation, furnishing and placing of all borrow which may be required, removal of all pavement (including base course and wearing surface), curbs, sidewalks, driveways and structures, and disposal of all material as specified herein, and for work specified under the general heading of 'Earth Work' in the standard specifications, for which no separate unit prices are included in the contract. Such payment shall include full compensation for all equipment, tools, labor and incidentals necessary to complete the work."

In support of its contention the claimant placed in evidence a blue-print entitled "Cross Section of Existing Pavement, S. B. I. Route 50," etc., which constituted a part of the plans prepared by the respondent on a certain Cicero Avenue project in Chicago, upon which bids were received at the same time they were received on the project involved in this case, on which project the claimant was also the successful bidder. Such blue print shows a brick surface course, a one-inch sand cushion, a six-inch Portland cement concrete base course, and underneath that an old five-inch Portland cement concrete pavement, eleven feet and five inches wide on each side of the street immediately adjoining the street car right-of-way which runs down the center of the street.

The improvement involved in the present proceeding, as originally contemplated by the respondent, provided for the removal of the old granite blocks and the sand cushion, patching the old concrete base where it was in bad condition, and then relaying the granite blocks on a new sand cushion. Claimant was the low bidder on that project, but upon taking a number of core drills, the respondent found that the concrete was so poor that it crumbled under the core machine, and therefore decided that it would be a waste of money to try to patch it; whereupon all bids were rejected, the project was abandoned and the project involved in this case was substituted therefor. Claimant knew of the core tests taken by the respondent and knew what was shown thereby, and based its bid in part upon the information in its possession as to the result of such core tests.

Claimant called as witnesses four other contractors who had bid upon this project, also a consulting engineer who

specialized in municipal improvement work and who had many years' experience in such work. Each of such four contractors testified in substance that he had no knowledge of the old street car track foundation before he submitted his bid; that he had no knowledge of the core tests made by the respondent; that before making his bid he made an examination of the site of the work by walking over the entire length thereof; that it was not customary for any contractor to make core tests on any job; that if there was a street car track foundation immediately underneath the existing pavement, he would expect the plans and specifications to show it; that from an examination of the plans and specifications involved in this project he would expect to find under the eight-inch concrete base of the old pavement just ordinary excavation, that is to say, such excavation as would ordinarily be found under a Chicago street.

The consulting engineer testified as an expert and stated in substance that in ordinary engineering practice the purpose of observing a Typical Cross Section is to give the contractor accurate information regarding existing conditions, and to show the relationship between the existing improvement and the proposed improvement; that its purpose also is to show the contractor what he may expect to find underneath the existing pavement, not only the relationship in dimensions but also the nature and quality of the material to be removed; that from an examination of claimant's Exhibits 2 and 3, contractors proposing to bid on the project would reasonably expect to find, first, the existing granite block and then a cushion from one inch to two inches in thickness, then an eight-inch concrete base, and then the materials ordinarily found in a city street under existing pavement; that a street car track foundation would not ordinarily be considered ordinary material to be found under the concrete base.

The respondent produced two witnesses connected with the water pipe extension department of the City of Chicago, who testified that between December 14th and December 30, 1933, at least four or five openings were made in Roosevelt Road for the purpose of installing test pipes; that such openings were about four or five feet long and the same width and

about eight feet in depth; and that they remained open for several days.

Respondent also offered in evidence the testimony of four contractors who bid on the job, each of whom had previous knowledge of the existence of the old street car track foundation. They testified in effect that the object of the Typical Cross Section of existing improvement offered in evidence was simply to show the relationship between the existing improvement and the proposed improvement; that the contractor was required to be governed by the specifications; that under the provisions of the specifications relative to special excavations it was necessary for the contractor to remove the sub-grade beneath the proposed pavement for the required distance regardless of the nature or character thereof; that it was incumbent upon the contractor to make such examination and such tests as were necessary to disclose the nature and character of the sub-grade to be excavated.

From a consideration of all of the matters in the record we are of the opinion that the proposal, the plans and specifications, the contract and everything included therein, must be considered together for the purpose of ascertaining and determining the meaning of such contract; also that the statement in the specifications to the effect that the Typical Cross Section is shown ''to give the contractor the approximate relationship between the existing cross section and the proposed cross section,'' must be construed to include, among other relationships, the relationship in dimensions.

The uncontradicted evidence discloses that the old street car track foundation was firmly bonded to and an integral part of the eight-inch Portland cement concrete base. The Typical Cross Section in evidence as Claimant's Exhibit 2 showed that the Portland cement base underlying the existing granite pavement was eight inches in thickness. The uncontradicted evidence also shows that throughout the entire length of the entire improvement and for a width of eighteen feet such Portland cement concrete base varied from twenty-four to twenty-eight inches in thickness. The showing in the Typical Cross Section to the effect that underlying the granite block pavement was an eight-inch Portland cement concrete base therefore was not in accordance with the facts.

Apparently the claimant and the respondent were both unaware of the existence of such street car track foundation.

That such foundation would have been shown in the plans, if the existence thereof was known to the respondent, is clearly indicated by the fact that in the plans for the Cicero Avenue project hereinbefore referred to, where a similar situation existed, the blue prints specifically showed the existence of the underlying pavement.

We conclude, therefore, that there was a misrepresentation on the part of the respondent, and that such misrepresentation was material.

There remains for consideration the question as to the effect of a material misrepresentation in a case of this kind.

The rule seems to be well settled that where the plans and specifications are prepared by the owner, and there is a material misrepresentation therein, and as the result of such misrepresentation the contractor is misled to his damage, he is entitled to recover the damage so sustained. The difficulty in cases of this kind lies in the application of this rule to the particular case.

The case of *Hollerbach* vs. *United States,* 233 U. S. 165, is one of the leading cases in this country on the questions here involved. In that case the plaintiff contracted with the United States for the repair of Dam No. 1 at Green River, Kentucky. After completion of the work plaintiff claimed that there was a material misrepresentation in the specifications prepared by the United States; that by reason thereof the cost of the work required to be done was substantially in excess of what it otherwise would have been, and sued to recover the damages sustained by reason of such misrepresentation.

The following paragraphs of the specifications were material to the issues involved in the case, to wit:

Paragraph 33—"The dam is now backed for about fifty feet with broken stone, sawdust, and sediment to a height of within two or three feet of the crest, and it is expected that a cofferdam can be constructed with this stone, after which it can be backed with sawdust or other material. The excavation behind the dam will be required to go to the bottom, and it is thought that a slope of 1 horizontal to 1.2 vertical will give ample room."

Paragraph 20—"It is understood and agreed that the quantities given are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders, or their authorized agents, are expected to examine the maps and drawings in this office, which are open to their inspection, to visit the locality of the work, and to make their own estimates of the facilities and difficulties attending the execution of the proposed contract, includ-

ing local conditions, uncertainty of weather, and all other contingencies."

Paragraph 70—"Investigation. It is expected that each bidder will visit the site of this work, the office of the lock master, and the office of the local engineer, and ascertain the nature of the work, the general character of the river as to floods and low water, and obtain the information necessary to enable him to make an intelligent proposal."

As they proceeded with the work plaintiffs found that the dam was not backed with broken stone, sawdust and sediment, as stated in paragraph 33 of the specifications, and below seven feet from the top to the bottom there was a backing of cribbing of an average height of 4.3 feet of sound logs filled with stone. As the result thereof the work was made much more expensive than if the representations inserted in the specifications had been true and only the character of the materials had been found which the specifications asserted was there.

Plaintiff in that case urged the same contentions which are presented in the case at bar, and in disposing of such contentions the court said:

"A government contract should be interpreted as are contracts between individuals, with a view to ascertaining the intention of the parties and to give it effect accordingly, if that can be done consistently with the terms of the instrument. In Paragraph 33 the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants. True, the claimants might have penetrated the seven feet of soft slushy sediment by means which would have discovered the log crib work filled with stones which was concealed below, but the specifications assured them of the character of the material,—a matter concerning which the government might be presumed to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the government, and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations. We think it would be going quite too far to interpret the general language of the other paragraphs as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt. If the government wished to leave the matter open to the independent investigation of the claimants, it might easily have omitted the specification as to the character of the filling back of the dam. In its positive assertion of the nature of this much of the work it made a representation upon which the claimants had a right to rely without an investigation to prove its falsity."

The case of *United States* vs. *Atlantic Dredging Co.*, 253 U. S. 1, was a case in which the facts were somewhat similar to the case at bar. After stating the facts, the court said:

"The case is, therefore, within the ruling of *United States* vs. *Spearin*, 248 U. S. 132, 136, 64 L. ed. 166, 169, 39 Sup. Ct. Rep. 59, where it is stated

that the direction to contractors to visit the site and inform themselves of the actual conditions of a proposed undertaking will not relieve from defects in the plans and specifications, citing *Christie* vs. *United States*, 237 U. S. 234, 59 'L. ed. 933, 35 Sup. Ct. Rep. 565; *Hollerbach* vs. *United States*, 233 U. S. 165, 58 L. ed. 898, 34 Sup. Ct. Rep. 553, and *United States* vs. *Utah*, N. & C. Stage Co., 199 U. S. 424, 50 'L. ed. 255, 26 Sup Ct. Rep. 69. It is held in those cases 'that the contractor ought to be relieved, if he was misled by erroneous statements in the specifications.' The present case is certainly within the principle expressed."

The case of *United States* vs. *Smith* involved a contract for the excavation of a ship channel in the Detroit River approximately twenty-one feet deep, and provided that "the material to be removed consists of sand, gravel and boulders, all in unknown quantities." It was subsequently discovered that there was a natural bed of limestone rock within the boundaries of the excavation called for by the contract which was not provided for by the contract. The officers of the defendant in charge of the work insisted upon the performance of the contract in accordance with its terms, including the removal of the limestone. The contractor was thereby put to considerable expense in addition to what he would have been required to pay had the material which was required to be removed consisted of sand, gravel and boulders as stated in the specifications, and proceedings were commenced in the Court of Claims to recover the damages sustained by the contractor. The Court of Claims held with the contractor and upon appeal to the Supreme Court of the United States, that court said:

"We think the case is within the principle of *Hollerbach* vs. *United States*, 233 U. S. 165. * * * We concur, therefore, with the declaration of the Court of Claims that the right of appellees to recover for the work done by them is indisputable."

The contentions involved in the cases heretofore cited were similar to those in the case at bar, and under the authority of such cases the provisions of the plans and specifications relied upon by respondent do not constitute a defense to the plaintiff's claim.

Respondent's contention that the claimant is seeking to obtain additional compensation for work performed under the contract, and that the payment of such compensation would be in violation of Section 19 of Article 4 of the Constitution is equally without merit. The plaintiff is not seeking to recover compensation for work done under the provisions

of the contract, but seeks to recover damages resulting from the misrepresentation of the respondent.

A somewhat similar state of facts was involved in the case of *Pitt Construction Co.* vs. *City of Alliance, Ohio,* 12 Fed. 2d, 28. In considering the questions there involved, the court said:

> "The suit is not brought to recover anything earned under the contract or for extra work of the character contemplated by the contract; it is brought to recover damages for the misrepresentation by which the contract was induced."

To the same effect see *Horgan* vs. *New York,* 160 N. Y. 518. As stated in the last case, "the unforseen obstruction that was encountered and that subjected this plaintiff to a large amount of extra work was entirely outside of the contract and stands unaffected by this provision."

Respondent also contends that under the provisions of the specifications, the action of the claimant in accepting the last payment under the contract without objection or reservation constitutes a release of all liability under said contract, and that the action of the Attorney General in waiving such provisions of the specifications was without authority and therefore not binding upon the respondent. The provisions of the specifications involved in this contention are as follows:

> "The acceptance by the contractor of the last payment as aforesaid, shall operate as and shall be a release to the Department from all claims or liability under this contract for anything done or furnished or relating to the work under this contract, or for any act of neglect of said Department relating to or connected with this contract."

It will be noted that these provisions purport to release the Department "from all claims or liability *under this contract.*" As previously stated, the liability of the respondent is not under the contract, but wholly outside of the contract, and consequently the provisions of the specifications relied upon do not constitute a defense under the facts of this case.

Furthermore, under the facts here involved, we are of the opinion that the Attorney General had authority to make the stipulation in question.

In considering the authority of the Attorney General, our Supreme Court, in the case of *People* vs. *Spring Lake District,* 253 Ill. 479, 504, where a similar question was involved, said:

"Appellees contend that the stipulation was one that the Attorney General had no power to enter into. Upon this branch of the case but little need be said. The Attorney General, under the law, is the sole representative of the people and the canal commissioners and has the power to file informations such as the one filed against appellees, and has power, both under the common law and under the statute, to make any disposition of such causes that he deems best to the interest of the State. (*Hunt* vs. *Chicago Horse & Dummy Railway Co.*, 121 Ill. 638; *Canal Comrs.* vs. *Village of East Peoria*, 179 id. 214). No serious question can be raised in respect to the power of the Attorney General to dismiss a suit brought by him, either with or without any stipulation, upon behalf of the opposite party."

The case of *Keithley* vs. *County of Clark*, 206 Ill. App. 500, and the cases there cited, support the right of the Attorney General to enter into the stipulation involved in this case.

It must also be borne in mind that the stipulation in question was admitted into the record on February 27, 1935, at the first hearing of this cause, by the Assistant Attorney General then in charge of the case, and that no question as to the right or authority of the Attorney General to enter into such stipulation was raised until after all of the evidence on both sides had been introduced, and the respondent's Statement, Brief and Argument was filed herein on March 27, 1940, by the Assistant Attorney General then in charge of the case.

If the respondent intended to raise the question as to the authority of the Attorney General to enter into the stipulation, it should have been done before the proofs were closed, so that the claimant would have been in position to take such steps as it considered necessary for the protection of its rights in the matter.

The final contention of the respondent is that the action of the claimant sounds in tort, and the State is not liable for the torts of its officers or agents.

This action is not based upon the negligence of any officer or agent of the respondent, and consequently the rule sought to be invoked by respondent has no application in this case.

In the case of *U. S.* vs. *Atlantic Dredging Co.*, 253 U. S. 1, hereinbefore cited, the court said:

"The government makes the point, however, that the implication of the case is that bad methods were used, and insists that the implication makes the action one for a tort, and not tenable against the United States. We cannot assent. There is no intimation of bad faith against the officers of the government, and the Court of Claims regarded the representation of

the character of the material as in the nature of a warranty; besides, its judgment is in no way punitive. It is simply compensatory of the cost of the work, of which the government got the benefit."

Furthermore, the last mentioned case originated in the United States Court of Claims, which court has no jurisdiction of tort actions. Under the Court of Claims law of this State, however, this court is expressly given jurisdiction of actions *ex delicto*. The contention of the respondent is not well taken.

Under the evidence and the law as set forth in the foregoing cases, the claimant is entitled to an award herein. The amount to which the claimant is entitled is not in dispute. The representatives of the respondent checked the work involved in this claim as it proceeded, and under the evidence it is clear that the amount to which the claimant is entitled is $23,092.09.

Award is therefore entered in favor of the claimant, Arcole Construction Company, for the sum of Twenty-three Thousand Ninety-two Dollars and Nine Cents ($23,092.09).